UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:25-CR-166 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CHINEDU OPUTE, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

The United States of America moves this Court to revoke the magistrate judge's pretrial release order pursuant to 18 U.S.C. § 3145(a)(1).  (Doc. 7.)  Defendant Chinedu Opute ("Opute") timely opposed the motion (Doc. 13), and the government replied (Doc. 14).  For the reasons stated below, the government's motion is GRANTED.

**I.**     **Background**

On April 16, 2025, a federal grand jury in the Northern District of Ohio returned an indictment charging Opute with one count of conspiracy to commit mail fraud and bank fraud in violation of 18 U.S.C. §1349; two counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2; one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); and four counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  (Doc. 1.)  The allegations relate to a years-long conspiracy to execute business email compromise schemes. (*Id*.)  An arrest warrant was issued.  On April 29, 2025, Opute was arrested near Atlanta, Georgia.  (Doc. 6.)

On April 29, 2025, the Pretrial Services and Probation Department in the Northern District of Georgia ("Pretrial Services") interviewed Opute and prepared its report. (Doc. 16.) During his interview, Opute stated he was born in Nigeria. (*Id*. at 134.)[1] His father and brother live in Nigeria. (*Id*.) His mother, with whom he no longer speaks, lives in Atlanta, Georgia. (*Id*.) Opute is married with three stepchildren. (*Id*. at 135.) All five of them live at an address in LaGrange, Georgia. (*Id*.) They have lived at that residence since February 2022. (*Id*.) Opute has been the owner of Vux Worldwide since 2018. (*Id*.) He became a naturalized United States citizen in 2019. (*Id*.) Opute denied having a United States passport. (*Id*.) He further represented he has not travelled outside of the United States since 2011. (*Id*.) Opute has one prior conviction, that being a 2015 conviction for reckless driving. (*Id*. at 136.) The Report assessed risk of flight and danger to others. (*Id*. at 136-37.) Although noting findings as to both, the Report recommended Opute be released on a $10,000 unsecured bond with stated conditions of release. (*Id*. at 137.)

On April 30, 2025, a detention hearing was held before Magistrate Judge Justin S. Anand of the Northern District of Georgia. (*See* Detention Hearing Transcript (Det. Hrg. Tr.), Docket No. 1:25-MJ-0433, Northern District of Georgia.)[2] Although asserting both risk of flight and danger to others, the government primarily argued the risk of nonappearance merited Opute's continued detention. (*Id*. at 7; Doc. 8-1.) Much like the government does here, the government highlighted inaccurate or misleading statements Opute made to Pretrial Services. First, Opute claimed he was living in LaGrange, but was actually surveilled by law enforcement agents living

---

[1] Unless otherwise noted, all citations are to the docket numbers assigned in this matter and the electronically stamped CM/ECF PageID#.

[2] The detention hearing transcript was not filed in this District. All citations are to the original page citations rather than electronically stamped CM/ECF citations.

in Sandy Springs.³ (*Id*. at 8.) Second, Opute claimed to be a United States citizen. (*Id*.) Opute remains a legal permanent resident, but he is not a United States citizen. (*Id*.) He was recently denied United States citizenship. (*Id*. at 11.) Finally, Opute claimed no foreign travel since 2011, but he has traveled to his home country of Nigeria and other destinations numerous times since 2013. (*Id*.at 9.) Specific to Nigeria, Opute has visited six times since 2013, with his most recent trip being December 1, 2023, to January 1, 2024. (*Id*.; Doc. 7 at 38-39.)

      The government also proffered the circumstances of the charged offenses. (*Id*. at 7.) The offense conduct involved a fraudulent scheme involving numerous fake identifications. (*Id*.) The government noted that Opute factory reset his cellular device at the time federal agents executed a search warrant at the Sandy Springs residence. (*Id*. at 8.) And when agents began to surveil him the morning of his arrest, Opute conducted evasive maneuvers such as driving through parking lots. (*Id*. at 10.) The government also directed the court's attention to Opute's personal contacts in Nigeria (family and law enforcement) and the assets he maintains there, including businesses, properties, vehicles, and financial accounts. (*Id*. at 8-9.)

      Opute responded to each of the government's arguments. Opute clarified he is a legal permanent resident and not a United States citizen, although he continues to pursue citizenship. (*Id*. at 13.) He also acknowledged selling assets after the search warrant was executed but claims he did so to pay for his defense counsel. To him, the indictment allegations suggest he was little more than a middleman in the alleged fraud. (*Id*. at 12.) Two sizeable wire transfers alleged in the indictment, one for $504,000 and the other for $337,000, both occurred in June 2023. (*Id*.) Other than a prior conviction for operating a vehicle while intoxicated, Opute has no criminal history, no bench warrants, and no failures to appear. (*Id*. at 13.) He is gainfully employed and

---

³ Opute was present at the Sandy Springs residence the morning the search warrant was executed in August 2024.

owns residences, some of which can be rented on Airbnb, that he uses for his entertainment business.  (*Id*. at 16-17.)  When asked by his counsel why he told the Pretrial Services that he has not traveled outside of the United States since 2011, Opute stated "maybe I didn't understand the question."  (*Id*. at 15.)  Opute acknowledge travel to Nigeria about once each year with his most recent travel being in January 2024, but he urged the court to consider that he had not travelled under fake names or with false identification.  (*Id*. at 16.)  Opute acknowledged selling assets shortly after the execution of the search warrant.  In explanation, he asserted the sale proceeds were "to invest [] in ways that would allow him to afford counsel."  (*Id*. at 15.)

In reply, the government pointed out that one of the properties Opute identified to Pretrial Services was sold in April 2025.  (*Id*. at 21.)  Opute's bank records and income statements – some of which Opute provided to a mortgage company – do not include income from businesses Opute now claims.  (*Id*.)  Finally, the government stressed Opute's significant and sustained connections to Nigeria.  (*Id*.)

At the conclusion of the hearing, Magistrate Judge Anand recognized flight concerns stemming from Opute's revocable status, frequency and unpredictability of travel in and around the Atlanta area, strong personal and financial ties with Nigeria, wiping his phone, and the significance of an indictment.  (*Id*. at 22.)  When weighed against Opute's Georgia connections, that he remained in the United States and maintained the same telephone number after learning of the federal investigation, and that he hired defense counsel, the magistrate judge concluded the government had not met its burden of demonstrating detention was warranted because a combination of conditions would reasonably assure Opute's appearance at future proceedings. (*Id*. at 22-23.)  The magistrate judge adopted the standard conditions of release with active GPS

monitoring, curfew to be determined by Pretrial Services, and that Opute reside only at the LaGrange address. (*Id.* at 28-31.)

The government immediately appealed, arguing the information it presented to the magistrate judge demonstrated a risk of nonappearance by a preponderance of the evidence. (Docs. 6, 7.) Opute responded that the magistrate judge's conditions of release sufficiently mitigated any concerns of nonappearance. (Doc. 13.)

II.     **Analysis**

Title 18, United States Code, Section 3145(a)(1) provides, in pertinent part, as follows:

> If a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court – the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . . .

District courts review a magistrate judge's order of pretrial release order *de novo*, meaning the district court makes an independent determination as to whether any condition or combination of conditions can reasonably assure the defendant's appearance or the safety of the community. *United States v. Johnson*, No. 22-cr-390, 2022 U.S. Dist. LEXIS 127146, at *4-5, 2022 WL 2800242 (N.D. Ohio July 18, 2022); *United States v. Trent*, No. 21-cr-516, 2022 U.S. Dist. LEXIS 2339, at *4, 2022 WL 44663 (N.D. Ohio Jan. 5, 2022). A hearing is not required. *United States v. Romans*, No. 00-5456, 2000 U.S. App. LEXIS 10708, *3, 2000 WL 658042 (6th Cir. May 9, 2000) (affirming district court's detention order after noting district court reviewed the magistrate judge's detention order and detention hearing transcript *de novo*).

Under the Bail Reform Act ("Act"), detention is only appropriate "if a judicial officer 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]'" *United States*

*v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(e)).  The statutory framework for analyzing whether release is proper requires weighing four specific factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involved a minor victim or controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including –
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1)-(4).

On appeal, the government focuses on the risk of nonappearance.  (Doc. 7 at 39.)  The government's burden is preponderance of the evidence.  *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004) (citing *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003)).  The "nature and seriousness of the danger" posed by release is not applicable when the government seeks detention based on a risk of nonappearance.  *See* 18 U.S.C. § 3142(g)(4).  In assessing a risk of nonappearance, courts "may take these additional factors into account: (1) whether some type of close supervision such as electronic monitoring is feasible; (2) whether the defendant has ties to other countries which would make it possible or likely for him to leave the United States; (3) and whether the defendant has ever absconded from supervision in the past,

has violated conditions of release, probation or supervised release in the past, or has failed to appear in court." *United States v. Humphrey*, No. 3:20-mj-04274, 2021 U.S. Dist. LEXIS 47995, *4, 2021 WL 964052 (M.D. Tenn. Mar. 15, 2021) (quoting *United States v. Cabrera*, No. 2:09-CR-287(2), 2009 U.S. Dist. LEXIS 123051, at *9-10, 2009 WL 5167668 (S.D. Ohio Dec. 18, 2009)).

The Court's assessment of the applicable Section 3142(g) factors is set forth below.

A.       **Nature and Circumstances of the Offense Charged**

Opute is charged with conspiracy to commit bank and mail fraud, substantive wire fraud offenses, conspiracy to commit money laundering, and four counts of aggravated identity theft. (Doc. 1.) Any person convicted of aggravated identity theft must be sentenced to term of imprisonment of two years, to be served consecutively to any term imposed for the underlying offense. *See* 18 U.S.C. §§ 1028A(a)(1), (b)(1)-(2), (c)(5).

None of these offenses involve violence, weapons, exploitation of others, or narcotics. *See* 18 U.S.C. § 3142(g)(1). In assessing a defendant's risk of nonappearance, however, allegations involving the use of another's means of identification are probative because they suggest the defendant's willingness to conceal his or her identity for fraudulent purposes.

Per the indictment allegations, Opute and his coconspirators phished email accounts of victim entities' employees. Once successful, they identified legitimate vendors for each victim entity. Opute and his coconspirators would pretend to be a representative of the legitimate vendor. Through these communications, they would cause victim entities to direct vendor payments to accounts Opute and his coconspirators controlled. After victim entities made what they believed were legitimate vendor payments, Opute and his coconspirators would promptly

redirect funds - in small amounts - to other accounts or instruments.[4]

At the detention hearing, Opute cast himself as a middleman, but the emails identified in the indictment suggest he played a significant role in accessing fraudulent accounts, maintaining account information, and directing transfers. On June 20, 2023, a coconspirator asks Opute for "full details" of the banking information. (Doc. 1 at ¶ 28(d).) The next day, Opute sends a screenshot reflecting the necessary account detail. (*Id*. at ¶ 28(e).) Two days later, Opute informs the coconspirator that the account is closed and sends different account information. (*Id*. at ¶ 28(g), (j).) Opute follows up with this directive: "Use this one." (*Id*. at ¶ 28(k).) Per the indictment, the total amount of fraudulent wire transfers from victim accounts between June 6, 2023, and June 13, 2023, was approximately $1,092,256.01. (*Id*. at ¶¶ 16, 18, 23.) A later attempt to direct a $469,200 wire transfer from a victim account failed. (*Id*. at ¶ 25.)

### B. Weight of the Evidence of Risk of Nonappearance

This factor "only goes to the likelihood of dangerousness or that the defendant will pose a risk of flight, 'not the weight of the evidence of the defendants' guilt.'" *United States v. Bothra*, No. 19-1092, 2019 U.S. App. LEXIS 9375, at *4-5, 2019 WL 8883547 (6th Cir. Mar. 28, 2019) (quoting *Stone*, 608 F.3d at 948).

The Court first considers Opute's statements to Pretrial Services. Opute told Pretrial Services he lived at and would return to his residence in LaGrange. The LaGrange home is where his wife and stepchildren reside. Based on the U.S. Citizenship and Immigration Services information provided by the government, there is documentation supporting the agency's determination Opute's marriage was fraudulent. (Doc. 14-1.) Additionally, federal agents

---

[4] Redirecting funds in small amounts reduces the risk that suspicious financial activity will be detected.

surveilled Opute for some time before his arrest.  (Doc. 7 at 36.)  He had been living at a Sandy Springs address, which is nearly 80 miles from the LaGrange home.  (*Id*.)  This was not disclosed to Pretrial Services.  Opute also claimed to be a United States citizen.  His efforts to obtain citizenship had been denied.  He was a lawful permanent resident at the time of his arrest, not a United States citizen.  Finally, Opute provided inaccurate information about foreign travel.  Opute suggested at the detention hearing that he "maybe" failed to understand the question, but the Court is not persuaded.  Opute appeared before this Court for arraignment.  (Minutes of Proceedings on 6/5/2025.)  No limitations on language or understanding were observed.  Thus, Opute simply has not provided any persuasive explanation for why he told Pretrial Services he has not travelled outside of the United States since 2011.  As detailed by the government, he has travelled outside of the United States approximately eight times since 2013, with seven of those instances occurring between March 2021 and January 2024.  (Doc. 7 at 38.)

Opute has acknowledged significant ties to Nigeria.  Five of his recent overseas trips have been to Nigeria.  He has family who resides there.  He is in frequent contact with telephone numbers assigned the Nigerian country code.  And, as the government has sufficiently proffered, he has significant assets in Nigeria, to include businesses, properties, and bank accounts.

Opute's sustained ties to individuals in Nigeria, financial and business assets in Nigeria, and the mandatory term of incarceration required if convicted of aggravated identity theft demonstrate Opute has both the means and the motive to flee.

### C.   History and Characteristics of the Person

Section 3142(g)(3)(A) and (B) specify the factors the Court must consider in assessing Opute's history and characteristics.  Opute is 42 years old.  (Doc. 16 at 134.)  He moved to the United States in 2011 and has lived in Georgia since that time.  (*Id*. at 134-35.)  Before that, he

lived in Nigeria.  Opute is estranged from his mother, who also lives in Georgia.  He was not living with his wife and stepchildren in LaGrange, but he indicated to Pretrial Services that he would return to that address if released.  (*Id*.)  At the time of his arrest, he was living with another woman and their minor child.  (Det. Hrg. Tr. at 13-14.)  That Opute was living in Sandy Springs was not disclosed to Pretrial Services, but it was observed during surveillance and acknowledged during the detention hearing.  He communicates frequently with a brother who lives in Nigeria.  Opute maintains significant assets in Nigeria, to include businesses, properties, accounts, and a vehicle.

Opute attended high school in the United Kingdom and returned to Nigeria where he obtained a college degree.  Opute is employed to varying degrees as a musician, entertainment manager, clothier, and rental property owner.  He owns Vux Worldwide, which appears to operate out of one of Opute's rental properties.

Pretrial Service's criminal record check is limited to offenses occurring within the United States, so from 2011 to present.  Opute's criminal record check revealed only one conviction during that time, that being a 2015 conviction for reckless driving.  There is no information Opute failed to appear or to comply with the terms of his probation.

### D.  Risk of Nonappearance

In assessing the risk of nonappearance, Opute's limited criminal history and prior compliance with the terms of probation weigh in favor of pretrial release with the stated conditions.  But the Court's assessment must also consider the extent and nature of Opute's foreign contacts, information he reset his phone, statements he made to Pretrial Services, and whether Opute has the means to abscond.

The magistrate judge concluded the government's concern Opute would flee overlooked

two points: airfare is substantial, and Opute would have to travel through a United States airport. The magistrate judge concluded GPS monitoring and other stated conditions of release would sufficiently mitigate any flight risk.  In reviewing the entirety of the record, in particular the briefs submitted to this Court after the detention hearing and the government's recent inclusion of United States Citizenship and Immigrant Services' reports, the Court finds the government has met its burden by a preponderance of the evidence and that no condition or combination of conditions will reasonably assure Opute's appearance.

Opute did not tell Pretrial Services that he was living in Sandy Springs.  He misrepresented his status in the United States.  He provided false information about foreign travel.  Records reveal Opute travelled abroad eight times since immigrating to the United States. Also, highly probative of his risk of nonappearance are Opute's ties to Nigeria.  His brother lives there.  Opute and his brother communicate monthly.  The government persuasively proffered that Opute maintains financial accounts, business, property and a vehicle in Nigeria.  The government also noted information that some of Opute's contacts in Nigeria include members of Nigerian law enforcement.

The allegations involve a business email compromise scheme that resulted in more than $1 million in losses.  Opute was the person who appeared to control or maintain account information.  Opute also appears to have rental properties, some of which he uses and some that appear to be available for rent.  Thus, there is information Opute has the means to purchase an airline ticket.  That Opute has not previously traveled under fraudulent identification information is of no moment.  As the magistrate judge recognized, the stakes are much higher now that Opute is indicted.  And, as noted above, certain counts mandate a term of imprisonment.

GPS monitoring and curfews can effectively mitigate nonappearance concerns, but only

if there is some indicia the defendant intends to comply with those conditions. The Court has given considerable thought to whether conditions that include GPS monitoring and a set curfew will reasonably assure Opute's appearance. There is evidence Opute wiped his phone within minutes of learning federal agents were executing a search warrant at the Sandy Springs residence. Opute was not candid with Pretrial Services about significant matters, namely foreign travel. As explained herein, Opute has both the means and the motivation to flee. His contacts with individuals in Nigeria, as well as assets available to him should he successfully abscond, are significant. Curfews can be violated. GPS devices can be removed. It is far easier for one to leave the country than to enter it. (Det. Hrg. Tr. at 10.) Based on the information before the Court, it simply cannot find that the contemplated conditions of pretrial release would reasonably assure Opute's appearance at future proceedings.

### III. Conclusion

Having conducted a *de novo* review of the entire record, and after considering the statutory requirements for pretrial release as well as the parties' arguments and submissions, the Court hereby finds the government has met its burden of demonstrating a risk of nonappearance by a preponderance of the evidence. On balance, the Court's assessment of the statutory factors weighs in favor of detention. There is no condition or combination of conditions that will reasonably assure Opute's appearance at future proceedings. Accordingly, the government's motion is GRANTED. Defendant Chinedu Opute will remain in the custody of the United States Marshal Service during the pendency of this case.

**IT IS SO ORDERED.**

Date: July 11, 2025

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE